IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Jake Smith,<br><br>   Plaintiff,<br><br> v.<br><br>Anthony De Los Santos and William Halfacre,<br><br>   Defendants. | Case No. 1:17-cv-08023<br><br>Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jake Smith, an inmate at Dixon Correctional Center brings this action under 42 U.S.C. § 1983. He alleges that Correctional Officer Anthony De Los Santos and Lieutenant William Halfacre violated his Eighth Amendment rights by failing to protect him from an imminent risk of serious harm posed by another inmate, Anthony Copeland. He also asserted a claim for conspiracy to use excessive force. Both Defendants now move the Court for summary judgment on the merits on his claim. They also assert the affirmative defense of qualified immunity. For the reasons below, the Defendants' motion [90] is denied as to the failure to protect claim and granted as to the conspiracy claim. Though Smith presents a triable question on his first claim, he has abandoned his claim of conspiracy.

 **I.** **Background**

On a motion for summary judgment, the Court typically recites the undisputed facts in the light most favorable to the nonmovant. In this case, the deposition testimony betrays stark differences of opinion regarding the events that

1

gave rise to this suit. Indeed, the summary judgment motion should never have been filed. Because the Court strains to locate any undisputed material facts, each account is summarized in turn beginning with the Plaintiff, Jake Smith.[1]

### a. Jake Smith

Jake Smith resided in an eight-person cell equipped with bunk beds and a bathroom, which those eight inmates shared with another room. The other room was a six-person cell. In all, as many as fourteen inmates shared that one bathroom. On the morning of December 1, 2015, Smith needed access to the bathroom, but Anthony Copeland was using it, and apparently taking his time. Undeterred, Smith repeatedly knocked on the door, apparently expressing his need for Copeland to hurry up. Displeased, Copeland opened the door and warned Smith "don't knock on this door no more before I beat your ass." Smith Dep. 43:11–12. Smith then left and used the bathroom in another inmate's cell. Smith explained that this was not the first disagreement over the bathroom. He contends that Copeland had been taking his time a day or two before as well, and that other inmates had the same problem with him.

Though Smith did not believe Copeland was going to do anything about it, he felt the need to report the incident to Officer De Los Santos. Smith explained that he was not afraid of Copeland but wanted to report and avoid the incident so he would not be disciplined for defending himself from Copeland's impending assault. *Id.* at 47: 18–24, 48:1–8. After using another inmate's bathroom, Smith walked up

---

[1] Because the parties' Local Rule 56.1 statements of undisputed facts proved unhelpful, the facts recited here are taken from the deposition transcripts attached to the motion. Dkt. 90.

to the desk where the correctional officers sat and reported the incident to De Los Santos. He told De Los Santos about Copeland's threat and the general problems with the bathroom. According to Smith, De Los Santos responded that he would take care of it and not to worry about it. *Id.* at 52:23–24, 53:1–4. Later, Smith went to the cafeteria and encountered Lieutenant Halfacre. He explained all the specifics of the incident to Halfacre who—on Smith's telling of the story—responded that he should take care of it himself. *Id.* at 56:17-24, 57:1 ("That's when Halfacre say, man, you a big motherfucker. You walk with a cane. I can't see nobody trying to mess with you on anything. If they do shit, put that cane on they ass."). Smith explains that Copeland saw him talking to the officers and that he overheard Copeland saying, "I'm going to fuck that old motherfucker up, watch." *Id.* at 59:7–10. Smith contends that, soon after, Copeland struck him in the back of the head, rendering Smith unconscious. Smith remembers none of the actual incident, however. The next thing he remembered was waking up in the hospital.

### b. Anthony Copeland

Copeland tells a significantly different story. Copeland explains that he was housed in Unit 58 but was assigned to Unit 59 (where Smith was) for about a week. On the morning of the incident, Copeland says some inmates were in the day room playing Scrabble. Copeland—who was watching the game—said something to one of the inmates, and, for reasons not explained, Smith took issue with it. Copeland responded that he was not talking to Smith, but that did nothing to stop Smith from continuing the conversation. Copeland then left the day room, and Smith followed

him back to his cell. Copeland went into his cell and Smith opened the door and asked to talk to him. So, Copeland went into the hallway, where Copeland says Smith acted aggressively. Copeland responded by punching Smith in the face, rendering him unconscious and causing him to fall back and hit his head on the floor.

### c. Officer De Los Santos and Lieutenant William Halfacre

Officer De Los Santos and Lieutenant Halfacre both offer little material evidence. Halfacre remembers nothing about that day but says he would have done something if Smith had reported a threat to him. He contends that any threat to an inmate's safety would have been taken seriously. Halfacre Dep. 36:13–16 ("We take every threat serious so it doesn't turn into something more dangerous. So even the littlest ones we follow up on the best we can."). He also adamantly argues that he would never have said what Smith alleges he said. *Id.* 55:7–11 (asserting that the statement "is something that never ever would have came out of my mouth to have an offender hurt another offender, let alone with a weapon, using a cane. That I know didn't happen, 100 percent. I would have never said that."). Halfacre also testified that he has never heard of Jake Smith. Thus, Lieutenant Halfacre's deposition testimony adds little beyond a denial of Smith's allegations and is otherwise limited to hypotheticals and general testimony about his job.

Similarly, De Los Santos argues that he remembers the day clearly but has no memory of ever speaking to Smith or Copeland that day. De Los Santos Dep. 8:11–22. He explained, however, that any threat of violence between inmates would

have been taken seriously as a severe threat. He would have had the authority to separate them and put Smith in an office room away from Copeland until a supervisor with transfer authority could intervene. *Id.* at 22:11–25, 23:1–8.

## II.     Analysis

Summary judgment is warranted if the evidence presents no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court must "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)). The initial burden lies with the movant to either show an absence of evidence supporting an essential element or to present affirmative evidence showing that an essential element cannot be satisfied. *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Then, the burden shifts to the nonmoving party to present evidence that establishes a genuine issue of material fact as to that element. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) ("Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case."). But a dispute of fact is only material if it might affect the outcome of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Critically, if a dispute of fact exists, so that "[a] reasonable jury could resolve [the] conflict either way," the conflict "makes it inappropriate to grant summary judgment." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018).

Although Smith originally asserted a claim for conspiracy to use excessive force, he abandoned that claim by failing to respond to the Defendants motion for judgment on the claim. *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996) ("Bombard abandoned his FMLA claim after failing to respond to the FMLA arguments in FWN's motion for summary judgment.").

### a. Failure to Protect

Prison officials must "take reasonable measures to guarantee the safety of the inmates" in their custody. *Farmer v. Brennan*, 511 U.S. 825, 822 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)). Prison staff that fail to live up to that obligation could face liability under the Eighth Amendment. *Id.* at 822–23. To establish a prison official's liability for failure to protect, a plaintiff must show (1) that he or she was "incarcerated under conditions posing a substantial risk of serious harm" and (2) that the prison official has a "sufficiently culpable state of mind." *Id.* at 823.

Defendants stylize their argument as asserting that Smith "has failed to establish a substantial risk of serious harm would occur." Dkt. 90-2, at 4. And they open the argument by asserting that "Plaintiff has failed to demonstrate that Copeland posed an undue threat to him preceding the December 1, 2016 incident."[2] *Id.* That sounds like an argument related to the first element. Nevertheless, the accompanying text of the brief almost entirely advances argument as to the second element.

---

[2] The date here appears to be incorrect. As explained above, the deposition testimony pegged the date of the incident as December 1, 2015, not 2016.

In *Farmer*, the Supreme Court defined what it means to have a sufficiently culpable state of mind:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

This has since been interpreted to mean that a defendant prison official must have had actual knowledge of a specific, nongeneralized threat to the inmate's safety. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). In *Gevas*, the Seventh Circuit explained that "[c]omplaints that convey only a generalized vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 480–81. The court then explained that "a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support [that] inference." *Id.* at 481. Still, although the plaintiff-inmate must complain of a specific threat, they "do not need 'advance knowledge of every detail of a future assault' to show that they faced a serious risk." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). In evaluating the specific threat a plaintiff-inmate communicates to the defendant prison official, courts must consider the totality of the circumstances, rather than each fact in isolation. *LaBrec v. Walker*, 948 F.3d 836, 842 (7th Cir. 2020) (explaining that "the overall context is the relevant focus,

7

and that must include consideration of all of the factors as a whole rather than as discrete, independent components").

Defendants rely on *Grieveson v. Anderson*, 583 F.3d 763 (7th Cir. 2008) and *Butera v. Cottey*, 285 F.3d 601 (7th Cir. 2002). But those cases explain why they are not entitled to judgment as a matter of law. First, in *Grieveson*, the Seventh Circuit held that some of the defendants were entitled to summary judgment because Grieveson never told them about "a specific threat to his life" and instead told them generally "that he was afraid and that he wanted to be moved." *Grieveson*, 538 F.3d at 776. Second, in *Butera*, the plaintiff merely told the correctional officers that he "was having problems in the block" and that he "needed to be removed." *Butera*, 285 F.3d at 606. Butera's mother had also called the jail to complain about threats made to her son, but she also did not identify the source of the threats. Thus, the court held the threat too generalized to impute actual, subjective knowledge onto the defendant officials. *Id.* at 607.

To contrast, in *LeBrec v. Walker*, LeBrec complained of threats made by his cellmate to stab him, a threat that later came to fruition. 948 F.3d 836, 843–44 (7th Cir. 2020). The Seventh Circuit noted that the parties offered disputed facts, with starkly different views of what happened. *Id.* at 843. But because the posture was summary judgment, "we do not resolve such credibility differences." *Id.* at 843–44 (explaining further that "we consider the evidence, including all reasonable inferences, in the light most favorable to LaBrec"). Unlike *Grieveson* and *Butera*, LaBrec identified a particular individual from whom he feared harm and a

8

reasonable basis for that fear. *Id.* Similar to the defendants' testimony here, Walker had "acknowledged that such a communication would warrant action." *Id.* at 844. "Walker did not recall LaBrec raising any such safety concerns, but that would be a factual dispute not resolvable on summary judgment." *Id.*

Although the Court takes no position on whose version of events is correct, the version that Smith testified to in his deposition presents a triable question for a jury. Taking Smith's version as true, Coleman threatened him over a dispute that arose from Coleman's extended use of the bathroom that was shared by as many as fourteen inmates. The threat was not generalized; Smith told De Los Santos and Halfacre that the threat came from Coleman. They assert that the threat was conditioned on him knocking on the bathroom door again. In other words, he controlled his own destiny. A jury might agree with that argument, though the jury could also point to the fact that the bathroom was shared by fourteen people. Smith would likely have to use it again at some point, and he would likely knock on that door again to make sure no one was using it before he walked in. But resolving that question is for the jury, not the Court. Similarly, the Defendants point out that Smith told another correctional officer that he did not have any issues with anyone in the unit. But that was after he was struck by Coleman. He had just woken up from being knocked unconscious. Dkt. 90-7, at 2. Given the head injury, and that Smith's memory apparently recovered later, a jury could still reasonably believe his story.

9

In reply, the Defendants assert that Smith did not actually fear for his safety from Coleman. Dkt. 97, at 2 ("Rather, Plaintiff feared what he would do to Copeland in the event they engaged in a physical altercation."). This implies that an inmate capable of defending themselves is not afforded the same level of protection from correctional officers than less capable inmates are afforded. That's nonsense. Just because Smith believed he would win a potential fight, does not mean he should be subjected to such a fight when the correctional officers could intervene and protect him, as the Constitution requires. After all, Smith would have been disciplined for fighting. "Prisoners lack even a right to invoke self-defense in disciplinary proceedings when they have resorted to violence as a means of protecting themselves." *Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015). And "a prisoner is not obligated to commit a disciplinary infraction in pursuit of his own safety." *Id.*

Therefore, because a reasonable jury could resolve the factual disputes in either direction, summary judgment is inappropriate.

### b. Qualified Immunity

The Defendants next argue that they are qualifiedly immune from liability for failure to protect. They advance two arguments: (1) that Smith cannot show he was subjected to a constitutional violation, and (2) that no clearly established law exists showing that a correctional officer may be held liable when no evidence exists of a substantial risk of harm. Dkt. 90-2, at 9. Both arguments fail. First, the Court has already explained why a reasonable jury could find that De Los Santos and

10

Halfacre violated Smith's Eighth Amendment Rights. And second, to the extent that the Defendants developed an argument on the first prong of the failure to protect analysis—the existence of a substantial risk of harm—that argument fails. Smith testified in his deposition that he was at risk of attack, and the Court has already explained why that risk was substantial.

Furthermore, the Defendants take an overly narrow approach to the qualified immunity analysis. In *Sinn v. Lemmon*, one of the defendant prison officials argued that he was entitled to qualified immunity because "no reasonable official in [his] position would have known that not immediately responding to Sinn's letter violated the Eighth Amendment." 911 F.3d 412, 422 (7th Cir. 2018) (alteration in original). The Seventh Circuit explained that this view of qualified immunity was too narrow. The Court then recited all the evidence supplying the inference that the defendant knew of the threat. *Id.* ("Here, it is reasonable to infer that Brush had such knowledge but took *no* responsive action. It is well-settled, clearly established law that such a failure constitutes deliberate indifference."). The same is true here. On Smith's telling of the facts, he explicitly informed both correctional officers of a specific threat to him from a specific person. Though he believed he would win the fight, the Seventh Circuit has clearly held that the prison officials cannot decline to protect inmates and instead expect them to resort to self-help violence. *Gevas*, 798 F.3d at 484. Furthermore, under Smith's version of the fact (which the Court must take as true for summary judgment purposes), if he told the Defendants about the threat, they testified in their depositions that they understood that they had an

11

obligation to intervene in the presence of threats to inmate safety. *E.g.*, Halfacre Dep. 26:20–24, 27:1–2, 36:13–16 ("We take every threat serious so it doesn't turn into something more dangerous. So even the littlest ones we follow up on the very best we can."); De Los Santos Dep. 10:3–14.

Thus, the Defendants have not shown that they are qualifiedly immune from liability for failure to protect.

### III. Conclusion

For the reasons explained above, the Defendants' motion for summary judgment [90] is denied.

*   *   *

This matter is referred back to the Magistrate Judge to discuss whether a settlement conference would be a worthwhile endeavor. If the parties are not interested in a settlement conference, then they should begin to prepare a draft of a final pretrial order and schedule a time to discuss that document with the Magistrate Judge.

Date: July 26, 2021

                                              Honorable Iain D. Johnston
                                              United States District Judge
                                              Northern District of Illinois
                                                       Western Division